IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
APR - 3 2009
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DINORAH COBOS,<br>    a/k/a Dinorah Cobos Mastascuso,<br><br>RAYMOND AZAR,<br><br>and<br><br>SIMA SALAZAR GROUP,<br>    d/b/a SSG,<br>    d/b/a Salazarco,<br>    d/b/a Sima International,<br>    d/b/a Pro-Sima,<br>    d/b/a Pro-Sima International,<br><br>                  Defendants | **FILED UNDER SEAL**<br><br>No. 1:09mj248<br><br>UNDER SEAL |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Perry J. Goerish, being first duly sworn, hereby depose and state as follows:

1.     I submit this affidavit in support of a criminal complaint charging DINORAH COBOS a/k/a Dinorah Cobos Mastascuso (COBOS), RAYMOND AZAR (AZAR), and SIMA SALAZAR GROUP, which does business variously as Salazarco, Sima International, Pro-Sima, and Pro-Sima International (hereinafter, collectively, SSG) with, *inter alia*, conspiracy to bribe a public official. I also respectfully request that arrest warrants be issued for COBOS and AZAR.

1

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), a position I have held since August 2004. I am currently assigned to the Washington Field Office, Northern Virginia Resident Agency in Manassas, Virginia. My duties include investigating alleged fraud against the government, bribery of government officials, and money laundering. Based on my experience, training, and participation in these types of investigations, I am familiar with the techniques used by persons engaged in such unlawful activities. I am authorized to investigate violations of the laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued in the name of the United States.

3. I am currently assigned to a joint investigation with the Defense Criminal Investigative Service (DCIS) and the United States Army Criminal Investigative Division (Army CID), into the activities of individuals and entities who participated in the misappropriation of millions of procurement dollars through bribery, fraud, and other means. These activities are being investigated as violations of 18 U.S.C. § 201 (bribery); 18 U.S.C. § 371 (conspiracy); and 18 U.S.C. §§ 1956-57 (money laundering).

4. Section 201(b) of Title 18, United States Code, provides that whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official with intent to influence any official act in the special maritime and territorial jurisdiction of the United States shall be imprisoned for not more than fifteen years. Section 371 of Title 18, United States Code, provides that whoever knowingly and willfully conspires, confederates, or agrees with another to commit an offense against the United States, where one or more of such persons does any act to effect the object of the conspiracy, each shall be fined or imprisoned for not more than five years.

5. The facts set forth in this affidavit are based on my personal knowledge; review of

law enforcement interview reports; knowledge obtained from other individuals, including other law enforcement officers; my review of documents and computer records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of this application for a criminal complaint and arrest warrants, it does not set forth each and every fact that I have learned during the course of this investigation or known to the United States Government at this time.

## The Subjects of the Investigation

### Sima Salizar Group

6. SSG is a Lebanese-owned military contracting company doing business in Afghanistan and Iraq. To date, SSG has been awarded over $73 million in reconstruction and supply contracts from the United States Army Corps of Engineers (USACE) in the Afghanistan Engineering District (AED), Kabul, Afghanistan, which include, *inter alia*, contract number W917PM-06-C-0053 (the Terin Kowt contract) and W917PM-07-C-0034 (the Rish Kvour contract).

  A. The USACE, a Department of Defense entity, provides engineering, construction, real estate, stability operations, and environmental management products and services for the Army, Air Force, other assigned U.S. Government agencies and foreign governments. The USACE has employees deployed and supporting the people and government of Afghanistan in the areas of reconstruction, restoration of electricity,

military construction, Coalition military operations, Afghan National Army, building infrastructure, training and operation facilities, Afghan Police Programs, and construction of dams, schools, medical clinics.

B. The Terin Kowt contract involves construction of the Terin Kowt Road in Afghanistan.

C. The Rish Kvour contract involves construction of the Afghan National Army (ANA) Commando Battalion Complex in Afghanistan.

### Dinorah Cobos

7. COBOS is an American citizen who currently resides in Dubai, UAE, and Lebanon. COBOS is employed by SSG as its Afghanistan Country Manager where her duties include negotiating payments, known as Request for Equitable Adjustments (REAs), for contracts that the USACE is seeking to terminate or complete.

### Raymond Azar

8. AZAR is a Lebanese citizen, employed by SSG and is COBOS's supervisor at SSG.

### The Confidential Source

9. Confidential Witness (CW1) is an office engineer for the USACE in Afghanistan. His/her duties include managing military contracts for goods and reconstruction services after the initial award of the contract and negotiating with contractors over payment for performance or nonperformance, which includes negotiating payments on REAs and contract terminations. CW1's duties also include determining the proper payment amount and ensuring that the total payment is for justified and legitimate expenses. CW1 has been in this position for more than

4

two years and has been cooperating with the FBI since December 2008. Between at least as early as December 2008, continuing until at least the date of this application, CW1 was assigned by the USACE to work with COBOS and SSG to negotiate payments on REAs submitted by SSG. As a civilian employee of the Department of Defense, CW1 is a public official within the meaning of 18 U.S.C. § 201, which states that the term "public official" includes, *inter alia*, an "employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, in any official function, under or by authority of any such department, agency, or branch of Government." CW1 was the initial witness and reported the crime(s). He/she has been cooperating with the FBI since December 2008 and has been found reliable because statements he/she made were later confirmed by a review of consensual monitoring of his/her conversations with the subjects. He/she has received no compensation for his/her cooperation. CW1 is not under investigation by the FBI or any federal law enforcement organization.

## Evidence Establishing Probable Cause

10. In January 2009, CW1 approached the FBI concerning what he/she believed to be a falsified document. Specifically, SSG prepared a submission for an REA pertaining to the Terin Kowt construction project. Within this REA, SSG and COBOS provided a subcontract proposal of $670,000 from Company 2, an Afghan-based company owned and operated by unindicted Co-Conspirator 1 (CC1). Based on CW1's knowledge and experience working on REAs and other contracts, he/she believed that this document, which supported the inflated request for more money, was falsified by SSG. CW1 established contact with CC1 regarding this document but was told to cease and desist by SSG. Through subsequent negotiations, SSG and

5

COBOS reduced the original fee of $670,000 to $120,000.

11.     As of February 25, 2009, SSG had submitted outstanding REAs totaling approximately $13 million in connection with several contracts that are currently pending completion by SSG. These REAs attempt to justify expenses that have been incurred by SSG which are above and beyond the expenses identified in SSG's initial contract proposals.

12.     On February 22, 2009, CW1 engaged in a consensual audio and video recorded meeting with COBOS and AZAR. The purpose of the meeting was to discuss SSG's outstanding REAs with the USACE. During the meeting, AZAR told CW1 that SSG was counting on him/her to facilitate approval of the REAs. AZAR said that CW1 was the kind of person he would hire at SSG once CW1 departed USACE. CW1 believed this was intended to be a benefit for securing the REAs. AZAR gave CW1 a Cuban cigar, and COBOS gave CW1 a bottle of wine and a bag of candy. AZAR then left the meeting, leaving CW1 and COBOS by themselves.

13.     After AZAR left the February 22 meeting, CW1 informed COBOS that he/she felt that the $8.9 million REA submitted by SSG for the Rish Kvour REA, had been inflated by at least $3 million. CW1 stated he/she could obtain approval for that REA if COBOS gave CW1 something in return. COBOS asked CW1 how much, and CW1 suggested a percentage, maybe one-half or one percent, of the REA amount. The meeting ended and COBOS told CW1 that they had a deal, but that she would prefer to do business in Dubai, UAE, or Lebanon. Furthermore, COBOS directed CW1 to open a bank account in Dubai, UAE.

14.     According to statements by CW1, COBOS provided him/her the email address dinorah20@gmail.com as her personal email address and requested that CW1 send emails to her at that email address. On February 22, 2009, shortly after the above-referenced meeting, an

email was sent from dinorah20@gmail.com to CW1. The following is the content of that email:

> Hi [CW1],
> I hope all our meetings from now on are as productive. It is a done deal we just have to work out the details and from your part, timing.
>
> Listen, please take up my offer for the RNR in Dubai soon. You just tell me the date and I will take care of all the details. If you want to continue further to the land of olives and wine, it is a better possibility. The guys will make sure that you have the time of your life.
>
> Listen, the dilution of Arak as we discussed depends on the quantity of water you add to it and the quantity you want to produce.
> 1/2% of Arak for every 5 cups of water
> 1% for 10
> 1.25% for 13
> 1.5% for 15 and so on
>
> This is very popular drink and Ray enjoys it very much. Just don't drink too much or you will get drunk fast. Anyway, you will get to try it soon when you are in Dubai. I will show you some of the places that serve it and you can also enjoy it at home.
> Well hope you take the offer and join us there.
> See you
> D

15. On February 24, 2009, during a consensual recording of a telephone call between COBOS and CW1, COBOS confirmed that the Arak recipe referred to the graduated amount of money that she and SSG would pay CW1 in return for payment on the outstanding REAs submitted by SSG to the USACE. According to CW1's understanding, he/she would receive, for example, a one percent payment of REAs totaling $10,000,000. CW1 also understood that COBOS was telling him/her in the email that if the money transfer was conducted in Dubai, UAE, as she had suggested during the February 22, 2009, meeting, that CW1 would thereafter be able to transfer the money back to the United States.

16. CW1 identified "Ray" in the email as RAYMOND AZAR. CW1 understood that

COBOS was telling him/her that AZAR knew of and consented to the payment structure COBOS had proposed for resolving outstanding REAs. During the February 24, 2009, telephone call, CW1 asked COBOS who knew of this arrangement. COBOS responded that only she, CW1, and her bosses, "Ray" [AZAR] and unindicted Co-Conspirator 2 (CC2), were aware of this arrangement.

17. On March 1, 2009, during a consensual recording of a meeting between COBOS and CW1, COBOS informed CW1 that CW1's first payment from SSG would be for 1% of the $8.9 million Rish Kvour REA.

18. On March 1, 2009, during a consensual recording of a telephone call between COBOS and CW1, COBOS told CW1 that the payment for the Rish Kvour REA would be transferred to CW1's account via multiple wire transfers of $9,950. COBOS stated that she would structure the transaction in this manner so as not to cause alarm.

19. On March 8, 2009, COBOS told CW1 in a consensual conversation that the payment had been made to his/her account, a bank account set up by the FBI to receive the payments. COBOS showed CW1 a receipt, in Arabic, which showed that a bank in Iraq had initiated a wire transfer in the amount of $40,000 to a bank account held in Manassas, Virginia.

20. On March 10, 2009, $16,962 was received, via wire, in the FBI account.

21. On March 23, 2009, CW1 spoke with COBOS telephonically and inquired about the location of the payments due him/her from COBOS and SSG. He/she asked why he/she had not received the full payment of $40,000. According to CW1, COBOS said that she did not know and that she would find out. According to CW1, he/she could overhear COBOS talking to AZAR about the status of the payments due to CW1.

## Conclusion

22. Based on the foregoing facts, I respectfully submit that probable cause exists that COBOS, AZAR, and SSG knowingly conspired to bribe CW1, a public official, with the intent to influence CW1's official acts in the approval and payment of SSG's outstanding REAs, and that COBOS committed overt acts in furtherance of that agreement, all in violation of 18 U.S.C. § 371; and that COBOS and SSG, directly and indirectly, corruptly gave, offered, and promised money to CW1, a public official, with the intent to influence CW1's official acts in the approval and payment of SSG's outstanding REAs, all in violation of 18 U.S.C. § 201(b)(1)(A).

23. By this affidavit and application, I respectfully request that arrest warrants be issued for Dinorah COBOS and Raymond AZAR.

_____
Special Agent Perry Goerish
Federal Bureau of Investigation

Sworn to and subscribed before me on this 3RD day of April, 2009.

_____/s/_____
John F. Anderson
United States Magistrate Judge